UNITED STATES

v.

**Ihsan M. ABDELHADI, Defendant.**

**No. 1:03CR610.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 26, 2004.

7. *See supra* note 1.

Raymond E. Patricco, Jr., United States Attorney's Office, Alexandria, VA, for Plaintiff.

Michael M. Hadeed, Jr., Becker Hadeed Kellogg & Berry PC, Springfield, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this criminal prosecution for wire fraud and naturalization fraud, the defendant first pled guilty to the offenses, then sought unsuccessfully to withdraw his plea and finally absconded prior to sentencing. The novel post-sentencing question presented is whether it was proper to enter an order pursuant to the All–Writs Act, 28 U.S.C. § 1651, (i) restraining the absconding defendant and others acting in concert with him from transferring, selling or engaging in any other action that would decrease the value of defendant's property and (ii) authorizing the government to file a notice of *lis pendens* on defendant's real property. This order issued and recitation of the facts and proceedings to date helps illustrate the compelling need for this extraordinary remedy in the instant circumstances.

### I.[1]

On December 23, 2003, defendant Ihsan M. Abdelhadi, a Jordanian national, was indicted on ten counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 based on defendant's scheme to defraud his employer, Olympic Imported Auto Parts, of approximately $108,000 over approximately a four year period from 1998 and 2002. Pursuant to this scheme, defendant, an employee and assistant manager at Olympic's Fairfax store since July 1991, authorized over 800 transactions in which he fraudulently indicated that an Olympic customer had returned a defective automobile

---

**1.** The facts set forth here are derived from the statement of facts that accompanied defendant's plea agreement and the plea colloquy.

part for a refund. In fact, no such customers or defective parts existed. So, instead of refunding the purchase price to a nonexistent customer, defendant prepared false documentation purporting to authorize a refund and then misappropriated that refund (i) by retrieving for himself the amount of the refund in cash from his cash drawer or Olympic's accounting department or (ii) by crediting the amount of the refund to his personal credit card or the credit card of a family member. Following his arraignment on these charges on January 5, 2004, defendant was released on an unsecured $25,000 personal recognizance bond with pretrial supervision.

In addition to the charges in the Indictment, defendant was also charged in a criminal information with one count of naturalization fraud in violation of 18 U.S.C. § 1425(a). This charge was based on the allegation that defendant had falsely indicated on his Application for Naturalization—Immigration and Naturalization Service ("INS") Form N–400—submitted to the INS service center in St. Albans, Vermont in June 2000, that he had never previously claimed to be a United States citizen, when in fact he had indicated on an INS Employment Eligibility Verification Form I–9 submitted to Olympic on two occasions, July 9, 1991 and June 25, 1997, that he was a United States citizen. Not only had defendant signed the Form N–400 under oath, but he later, also under oath, confirmed the accuracy of the information included on that form during an interview with a naturalization examiner in Arlington, Virginia. Thereafter, pursuant to that fraudulent application, defendant became a naturalized citizen on May 17, 2001.

On March 10, 2004, five days prior to the scheduled trial on these charges, de-

fendant, pursuant to a plea agreement, pled guilty to (i) one count of wire fraud and (ii) one count of naturalization fraud. *See United States v. Abdelhadi,* Criminal Action No. 03–610–A (E.D.Va. Mar. 10, 2004) (Plea Agreement). Following a plea colloquy conducted in accordance with Rule 11, Fed.R.Crim.P., defendant's guilty plea was accepted as knowingly and voluntarily made and as supported by an independent basis in fact. By separate orders that same day, the remaining nine counts of the Indictment were dismissed, the final order admitting defendant to United States citizenship was revoked, set aside, and declared void, and defendant's certificate of naturalization was cancelled. *See United States v. Abdelhadi,* Criminal Action No. 03–610–A (E.D.Va. Mar. 10, 2004) (Orders). Defendant was also ordered to surrender his United States passport. Although he thereafter surrendered his United States passport, he told the supervising pre-trial services officer that his Jordanian passport had been lost in the mail and thus never surrendered that passport.

On July 2, 2004, prior to sentencing, defendant, by counsel,[2] moved to withdraw his guilty plea pursuant to Rule 11, Fed. R.Crim.P., on the grounds (i) that defendant had received ineffective assistance of counsel in preparing a defense to the charged offenses, (ii) that defendant was innocent of the charged offenses, and (iii) that defendant's guilty plea was unknowing and involuntary because defendant was not aware that his plea would affect his immigration status, namely that he would be classified as an aggravated felon, deported without available relief or waiver, and not permitted release on bond were he charged as an alien subject to removal by the Department of Homeland Security.

---

**2.** On June 18, 2004, defendant's appointed counsel was allowed to withdraw as defendant had retained new counsel to represent him with regard to the motion to withdraw his guilty plea and sentencing.

Oral argument on this motion was heard on July 9, 2004 at which time defendant's motion to withdraw was denied for the reasons set forth in Part II below. At that hearing, the government proffered evidence that pointed convincingly to defendant's guilt on both charges. This evidence included:

(i) testimony of an Olympic customer that he, the customer, never returned an automobile part that defendant had indicated had been returned and indeed that the original part remained on the customer's car;

(ii) testimony of an Olympic supervisor concerning Olympic's extensive investigation of the fraudulent transactions, which included extensive review of documents and computer records relating to returned parts, including an inventory of returned parts that confirmed that none of the parts defendant processed as returned were in fact returned;

(iii) testimony of an Olympic supervisor that defendant was one of only two managers with signature authority to authorize cash refunds on returned parts and that the return of non-existent parts was typically processed at defendant's assigned computer terminal and did not occur when defendant was absent from work or on vacation;

(iv) testimony of an Olympic employee who claimed that he witnessed the defendant process a return when no customer was present; and

(v) evidence that many fraudulent return transactions were credited to defendant's personal credit card.

Defendant was not, however, sentenced at the July 9 hearing. Instead, sentencing was continued to July 15, 2004 to allow defendant a further opportunity to address the government's motion for a two-level enhancement based on defendant's alleged abuse of a position of trust pursuant to § 3B1.3. *See* U.S. Sentencing Guidelines Manual § 3B1.3 (2003). Because defendant's motion had failed and defendant now faced a substantial term of imprisonment, the government moved on July 9 to revoke defendant's release on conditions and a bond. This motion was denied after it was confirmed that defendant had consistently complied with all the conditions of release and owns a home in Maryland where he was residing with his wife and two children, all of whom are American citizens. Defendant, however, was directed to contact his pre-trial services officer twice a day prior to the sentencing hearing and reminded that he would be responsible for $25,000 bail in the event he absconded.

Despite this, it became clear on the morning of July 15, prior to the scheduled sentencing hearing, that defendant had absconded. Specifically, when defendant failed to contact the pre-trial services officer that morning, the officer contacted defendant's wife who, in tears, stated that defendant had departed that morning, that she was unaware of defendant's whereabouts, and that he had left her several notes indicating that he intended to flee the country. When defendant failed to appear at the scheduled sentencing hearing, a bench warrant issued for his arrest, and sentencing was continued until July 19, 2004. During the course of the July 15 hearing, the government repeated its proffer of evidence regarding defendant's guilt.

When defendant again did not appear for sentencing on July 19, he was sentenced *in absentia* [3] to (i) twenty-seven

**3.** Rule 43(c), Fed.R.Crim.P., provides that:
A defendant who was initially present at trial, or who had pleaded guilty or nolo contendre, waives the right to be present under the following circumstances: (A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial.

(27) months imprisonment, (ii) three years supervised release, and (iii) restitution payments to Olympic in the amount of $108,535.31.[4] This sentence was based on an offense level of seventeen (17) and a criminal history category of I.[5]

In addition to the sentence imposed, upon motion by the government, an Order was entered pursuant to the All–Writs Act, 28 U.S.C. § 1651, (i) enjoining and restraining defendant, his representatives, attorneys, agents, family members, and assigns from transferring, selling, encumbering, hypothecating, spending or attempting or completing any action that would affect or diminish the marketability or value of defendant's property subject to restitution pursuant to defendant's plea agreement and the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663, and (ii) authorizing the government to file a notice of

---

Authority interpreting Rule 43 makes clear that a defendant may be sentenced *in absentia* in the event the defendant, after making an appearance at trial or during plea proceedings, voluntarily absents himself from sentencing. *See Crosby v. United States*, 506 U.S. 255, 258–59, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993); *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir.2001) ("The voluntary waiver exception in Rule 43(b)(2) likewise encompasses the situation where a defendant impliedly waives his right to be present by absconding before sentencing."); *United States v. Jordan*, 216 F.3d 1248, 1248–49 (11th Cir. 2000) (concluding that defendant could be sentenced *in absentia* after he pled guilty to drug crime and then escaped from detention prior to sentencing); *United States v. Fato*, 208 F.3d 210 (Table), 2000 WL 285413, at *1 (4th Cir.2000) (unpublished disposition) (stating that district court had jurisdiction to sentence defendant *in absentia* after defendant fled prior to sentencing); *United States v. De Prima*, 165 F.R.D. 61, 64 (E.D.Va.1996) (permitting sentencing *in absentia* when defendant appeared for the first three days of trial, then fled and never reappeared). As it is clear that defendant's absence is voluntary, there is no doubt that it was proper to sentence him *in absentia*.

4. By separate Order dated July 19, defendant was directed to pay restitution in the amount of $108,535.31, due and payable immediately. In the event defendant failed to pay restitution in full immediately, he was directed to pay $250 per month upon release from confinement until the total amount of restitution is paid in full. *See United States v. Abdelhadi*, Criminal Action No. 03–610–A (E.D.Va. July 19, 2004) (Order).

 18 U.S.C. §§ 3663(a)(3) and 3663A(a)(1) authorize a court to order restitution at sentencing. *See* 18 U.S.C. § 3663(a)(3) ("The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement."); 18 U.S.C. § 3663A(a)(1) ("Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.").

5. The offense level was calculated as follows under the United States Sentencing Guidelines. The wire fraud offense had a base offense level of six (6), § 2B1.1, which was increased to fourteen (14) on the ground that the loss agreed to in the plea agreement was greater than $70,000, § 2B1.1(b)(1)(E). The government's motion for a two-level enhancement for obstruction of justice under § 3C1.1 was granted because defendant absconded. U.S. Sentencing Guidelines Manual § 3C1.1, cmt. n. 4 ("The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies: ... (e) escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding. ..."). The government's motion for a two-level enhancement for abuse of a position of trust under § 3B1.3 was denied on the ground that it was not clear that, as an assistant manager, defendant was subject to "significantly less supervision than other employees whose responsibilities are primarily nondiscretionary in nature." U.S. Sentencing Guidelines Manual § 3B1.3, cmt. n. 1. Thus, the total offense level for this offense was sixteen (16). The naturalization fraud had a base offense level of eight (8). Accordingly,

*lis pendens* on defendant's real property. *See United States v. Abdelhadi*, Criminal Action No. 03–610–A (E.D.Va. July 19, 2004) (Restraining Order). This Order was intended to ensure that defendant's property would be available for restitution in the event defendant continued to be a fugitive and failed to pay the restitution. At issue here is the propriety of this Order. Before proceeding to an analysis of this question, it is useful to review the reasons for the denial of defendant's motion to withdraw his guilty plea.

## II.

 Rule 11(d), Fed.R.Crim.P., makes clear that once a defendant has pled guilty, he does not have an absolute right to withdraw his guilty plea, but instead must demonstrate a "fair and just reason" for the withdrawal. Rule 11(d), Fed. R.Crim.P.; *see also United States v. Ubakanma*, 215 F.3d 421, 424 (4th Cir.2000).[6] District courts have discretion to determine whether a defendant has met his burden under the Rule. *See United States v. Bowman*, 348 F.3d 408, 413 (4th Cir. 2003); *United States v. Lambey*, 974 F.2d 1389, 1393 (4th Cir.1992) ("The decision to permit the defendant to withdraw a plea is discretionary....."). In doing so, courts typically consider the following six nonexclusive factors:

(1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary;

(2) whether the defendant has credibly asserted his legal innocence;

(3) whether there is a delay between the entering of the plea and the filing of the motion;

(4) whether defendant has had close assistance of competent counsel;

(5) whether withdrawal will cause prejudice to the government; and

(6) whether it will inconvenience the court and waste judicial resources.

*United States v. Moore*, 931 F.2d 245, 248 (4th Cir.1991). The first two of these factors are clearly the most important and deserve close scrutiny in any request to withdraw a guilty plea.

Defendant argued that he should be allowed to withdraw his guilty plea on the grounds (i) that he received ineffective assistance of counsel in preparing a defense to the charged offenses, (ii) that he was innocent of the charged offenses, and (iii) that his guilty plea was unknowing and involuntary because he did not know that his plea could result in his deportation. Yet, in his pleadings and at the July 9 hearing, defendant adduced no persuasive factual or legal support for these grounds. Moreover, an analysis of all six *Moore* factors compelled the conclusion that defendant had failed to demonstrate a "fair and just reason" for the withdrawal of his guilty plea.

 To begin, defendant argued unpersuasively that the first *Moore* factor weighed in favor of withdrawal because defendant did not know that his plea could result in his deportation and thus did not enter the plea knowingly and involuntarily.[7] Defendant's argument in this regard

under § 3D1.3, the combined adjusted offense level was seventeen (17).

**6.** Courts interpreting the Rule's language have defined a "fair and just reason" as one that "essentially challenges" the fairness of the proceeding. *United States v. Puckett*, 61 F.3d 1092, 1099 (4th Cir.1995).

**7.** 8 U.S.C. § 1227(a)(2)(A)(iii) provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1101(a)(43)(M) provides that an offense "involv[ing] fraud or deceit in which the loss to the victim or victims exceeds $10,000" is an aggravated felony.

failed as it is settled in this circuit that neither the court nor defense counsel must inform a defendant of the collateral consequences of a guilty plea, such as deportation. *See United States v. DeFreitas,* 865 F.2d 80, 82 (4th Cir.1989) ("We cannot say that counsel performed unreasonably in merely neglecting to inform DeFreitas that he might be subject to deportation or denied re-entry into the United States because of his guilty plea.") (citing *United States v. Yearwood,* 863 F.2d 6, 8 (4th Cir.1988)); *Hatami v. Ridge,* 270 F.Supp.2d 763, 769 n. 16 (E.D.Va.2003); *United States v. Mora–Gomez,* 875 F.Supp. 1208, 1211 (E.D.Va.1995).

█ In any event, this ground was also factually meritless as the record reflects that defendant was in fact informed, both by the terms of the plea agreement itself and in the course of his plea colloquy, that his plea could result in his removal or deportation. The plea agreement states (i) that the government makes no promises concerning defendant's future immigration status and (ii) that defendant "agrees that should [the Department of Homeland Security] ultimately deport or attempt to deport the defendant, the defendant will remain bound by this plea agreement." And defendant made unmistakably clear in the course of his plea colloquy[8] that he had read, understood, and agreed to the terms of the plea agreement.[9] Moreover, during the plea colloquy, the Court emphasized to defendant that the government had made no promises to him that he would be allowed to remain in the United States and that in the event he were deported or removed, he would remain bound by the terms of the plea agreement. Significantly, defendant clearly indicated that he understood this term as one of the terms of the plea agreement.[10]

8. In this circuit and elsewhere, courts have made clear that an evaluation of the plea colloquy is the central consideration on a motion to withdraw. *See Bowman,* 348 F.3d at 414 ("The most important consideration in resolving a motion to withdraw a guilty plea is an evaluation of the Rule 11 colloquy at which the plea was accepted.") (citing *United States v. Wilson,* 81 F.3d 1300, 1307 (4th Cir.1996)). This is so because "[t]he Rule 11 colloquy is designed to provide a structure to protect the defendant against making an uninformed and involuntary decision to plead guilty and to protect the public from an unjust judgment of guilty when a public trial has not been conducted." *Bowman,* 348 F.3d at 417. Given the importance of the plea colloquy, under most circumstances, "a properly conducted Rule 11 guilty plea colloquy leaves a defendant with a very limited basis upon which to have his plea withdrawn." *Id.* at 414.

9. THE COURT: Now, you have a plea agreement with the government, Mr. Abdelhadi. Have you read that plea agreement?

THE DEFENDANT: Yes, your honor.

THE COURT: Have you reviewed it with Mr. Race, your counsel?

THE DEFENDANT: Yes, your honor.

. . . . .

THE COURT: I am going to have the court security officer now hand you what appears to be your plea agreement. I want you to look at it, Mr. Abdelhadi, and tell me whether that is your plea agreement and whether that is your signature appearing at the end of it, signifying that you have read, understood and agreed to the terms and conditions of the plea agreement.

THE DEFENDANT: That is my signature, your Honor.

THE COURT: And does that signature appearing there at the end of the plea agreement indicate that you have read the agreement, understand it and agree to its terms and conditions?

THE DEFENDANT: Yes, your Honor.

10. THE COURT: ... The plea agreement goes on to provide that the government has made no promises or representations to you concerning the consequences of your plea on your immigration status, other than denaturalization. So, the government has not promised that you will be allowed to remain in the U.S.

If you should subsequently or ultimately be removed or deported by the Department of

Nor was defendant's claim that his plea was involuntary persuasive as the plea colloquy established without any doubt that no one had pressured, coerced, or forced him to plead guilty; indeed, he agreed under oath that he was pleading guilty freely, willingly, and voluntarily because he was in fact guilty.[11] Moreover, at the July 9 hearing defendant himself agreed with the Court's observation that defendant was not someone who could be "pushed around."[12] Simply put, there was no evidence that defendant's plea was involuntary and instead there was abundant evidence to the contrary.

The same is true for defendant's claim that his guilty plea was not knowingly made. This claim is also conclusively refuted by his sworn statements in the plea colloquy. In this respect, defendant asserts that his plea was unknowing because the plea agreement stated that defendant would "retain the right to seek any relief you may have from deportation by Homeland Security." In fact, he did retain any

such right, *if it existed;* but nothing in the plea agreement stated that such a right existed. That defendant may not succeed in obtaining relief from deportation is a possibility the plea agreement contemplates and hence this possibility does not render his plea unknowing.

■ The second *Moore* factor, namely whether defendant credibly asserted his innocence, like the first also weighed against withdrawal. A defendant's "mere allegation of innocence" is typically "not entitled to much weight." *United States v. Wells,* 82 F.3d 411 (Table), 1996 WL 174631, at *5 (4th Cir.1996) (citing *United States v. Cray,* 47 F.3d 1203, 1209 (D.C.Cir.1995)). Instead, on a motion to withdraw, a defendant must come forward with evidentiary support for his innocence. *See id.* Even in the face of some evidentiary support, however, a defendant often cannot credibly assert his innocence when he clearly admitted his guilt during the plea colloquy, particularly when the government, as here, also proffers substantial evidence of defendant's guilt.[13] Thus,

---

Homeland Security, you will remain bound by the plea agreement. But you retain the right to seek any relief you may have from deportation by Homeland Security. . . .

Now, Mr. Abdelhadi, are those the terms of your plea agreement with the government, as you understand it?

THE DEFENDANT: Yes, your honor.

11. THE COURT: Has anyone made any other or different kind of promise or assurance to you of any kind whatsoever, in an effort to induce you to plea guilty?

THE DEFENDANT: No, your Honor.

THE COURT: Has anyone tried to force you or to pressure you or to coerce you in any way to plead guilty in this case?

THE DEFENDANT: No, your Honor.

THE COURT: Are you pleading guilty then, freely, willingly and voluntarily because you are, in fact, guilty?

THE DEFENDANT: Yes, your Honor.

12. The Court stated during that hearing that "defendant didn't impress me [during the plea colloquy] as [someone who is malleable or suggestible] and he doesn't impress me as

such an individual now. I don't think this defendant can be pushed around." Defendant stated later during the same hearing that "I am a person that you can't really push me around. . . ."

13. *See Bowman,* 348 F.3d at 415 (denying motion to withdraw guilty plea when defendant admitted to guilt at Rule 11 hearing and the government presented testimony of four witnesses corroborating his guilt); *United States v. Dogan,* 155 F.3d 561 (Table), 1998 WL 406854, at *2 (4th Cir.1998) (unpublished disposition) (finding that defendant's claim of legal innocence did not support withdrawal because defendant "admitted to his distribution activity at the Rule 11 colloquy, and his claim of innocence is contradicted by the testimony of three detectives and two [confidential informants]") (citing *United States v. Sparks,* 67 F.3d 1145, 1151–53 (4th Cir.1995) and *United States v. DeFusco,* 949 F.2d 114, 120 (4th Cir.1991)); *United States v. Hernandez,* 141 F.3d 1160 (Table), 1998 WL 209034, at *3 (4th Cir.1998) (unpublished disposition) ("[Defendant] makes no credible assertion of

withdrawal is unwarranted under the second *Moore* factor because (i) defendant, at the plea colloquy, described his role in the charged offenses in detail [14] and stated that the government's recitation of the facts with regard to the charged offenses was true and accurate in all respects [15] and (ii) the evidence proffered by the government at the July 15 and 19 hearings pointed convincingly to defendant's guilt on both charges. Moreover, defendant's claim of innocence with regard to the wire fraud offense on the ground that someone else used his credit card to conduct the fraudulent transactions was wholly unpersuasive (i) because defendant failed to adduce any facts or reasons to explain why another individual would conduct these fraudulent transactions for defendant's benefit and why defendant did not notice

---

innocence but rather admitted three times during the plea hearing that he was guilty of participating in a [continuing criminal enterprise]."); *United States v. Wilson*, 81 F.3d 1300, 1309 (4th Cir.1996) (stating that "defendant's failure to raise his concern [regarding his innocence at the Rule 11 hearing] might fairly be considered a waiver of the opportunity to raise it later").

Notably, in other contexts as well, courts in this circuit have held that "[s]tatements of fact by a defendant in a Rule 11 proceeding" are accorded significant weight and "may not ordinarily be repudiated" on a motion to withdraw. *Lambey*, 974 F.2d at 1395 (relying on defendant's "statements at the Rule 11 hearing that he was aware that no sentence had yet been determined and that he could receive a sentence up to life imprisonment" in denying defendant's motion to withdraw on the ground that he was unaware of the possible severity of his sentence prior to pleading guilty).

**14.** With regard to the naturalization fraud charge, the defendant engaged in the following colloquy:

THE COURT: Did you do what's charged in the information, Mr. Abdelhadi?

THE DEFENDANT: Yes, your Honor.

THE COURT: Tell the Court in your own words, sir, what you did?

THE DEFENDANT: I falsified the information on the INS form. I believe it asked if I had ever claimed to be a U.S. citizen in the past, and I check the box "no," and I did.

THE COURT: And you had claimed to be an American citizen in the past?

THE DEFENDANT: Well, when I applied for the job at the work, at my ex-employment.

THE COURT: All right. And did you submit this form by signing it and affirming that everything in it was true and accurate?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you submit it in April of 2001?

THE DEFENDANT: Yes, your Honor.

With regard to the wire fraud charge, the defendant engaged in the following colloquy:

THE COURT: Did you do what's charged in Count 6 of the indictment?

THE DEFENDANT: Yes, your Honor. I did issue a credit to my own personal credit account.

THE COURT: All right. Tell me in a little more detail what you did, Mr. Abdelhadi?

THE DEFENDANT: I issued a credit invoice, and went ahead and credited it to my own personal credit card, through the machine at the place of employment.

. . .

THE COURT: And tell me what you did to insure that this credit card charge would inure to your credit or benefit?

THE DEFENDANT: I just went ahead and credited a part to a retail account, and went ahead and charged the amount to my own personal credit card.

THE COURT: So, in other words, you created paperwork that suggested that your employer had this debt to this—

THE DEFENDANT: Customer.

THE COURT:—customer, and then you arranged, by this credit card charge, to have your employer pay you, posing as this customer?

THE DEFENDANT: Yes, your Honor.

**15.** THE COURT: Was that recitation of facts by Mr. Patricco true and accurate in all respects?

THE DEFENDANT: Yes, your Honor.

or report the illicit transactions on his monthly statements and (ii) because the only evidence defendant offered in support of his innocence claim are affidavits of biased witnesses, namely defendant's wife and defendant's former co-workers who were allegedly mistreated by Olympic, none of whom directly addressed the compelling documentary evidence of guilt.

■ The third *Moore* factor, namely the delay between the plea and the withdrawal motion, was not an obstacle to withdrawal as a four-month delay in this regard is not significant. *See Bowman*, 348 F.3d at 415–16 (holding that a three month delay was "not too long" such that the third *Moore* factor "slightly favored Bowman's cause"); *but see Moore*, 931 F.2d at 248 (finding six-week delay in filing motion to withdraw guilty plea too long). A substantially longer delay would likely militate against withdrawal as it would cast further doubt on defendant's claim of innocence and likely result in greater prejudice to the government.

■ The fourth *Moore* factor, namely whether defendant had the advice of competent counsel in entering the guilty plea, like the first two factors, also weighed against withdrawal. To prevail on this factor, defendant must demonstrate "(1) that his counsel's performance 'fell below an objective standard of reasonableness' and (2) that 'there [was] a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.' " *DeFreitas*, 865 F.2d at 82 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)); *see also Bowman*, 348 F.3d at 416. Defendant argued that his counsel was ineffective because he failed (i) to conduct a reasonable investigation of the charged offenses and (ii) to investigate whether defendant would be deported. Yet, defendant failed to present any persuasive evidence with regard to

either of these allegations and thus failed to establish the first prong of the two-pronged test. Defendant's conclusory claims in this regard were plainly insufficient. *See Ubakanma*, 215 F.3d at 425 ("Ubukanma's conclusory claims that he was 'misinformed' or 'intimidated' into pleading guilty are insufficient to overcome the district court's findings and Ubukanma's sworn statements that he was not coerced."). Moreover, defendant's allegation of ineffective assistance on the ground that defense counsel failed to investigate the immigration consequences of the plea was not sufficient because defense counsel was not obligated to inform defendant of the collateral consequences, *i.e.*, deportation, of the plea. *See DeFreitas*, 865 F.2d at 82; *Mora–Gomez*, 875 F.Supp. at 1211 (stating that "ineffective assistance does not occur where counsel fails to tell the defendant that his plea may or will result in deportation").

Even assuming defendant had established that his counsel's performance "fell below an objective standard of reasonableness," he would not have been entitled to withdraw his plea on this ground because he did not demonstrate a "reasonable probability that, but for counsel's error, he would not have pleaded guilty." *DeFreitas*, 865 F.2d at 82 (citing *Hill*, 474 U.S. at 57, 59, 106 S.Ct. 366). Simply put, given the strength of the evidence against defendant and the lack of any persuasive exculpatory evidence, there was no reasonable probability that defendant would have elected not to plead guilty.

The fifth *Moore* factor, namely prejudice to the government, was not an obstacle to withdrawal as the government has not indicated that any of its evidence is now stale or would be unavailable at the time of trial. And, the sixth *Moore* factor, namely inconvenience and waste of judicial resources, is rarely significant and was not

so here where it did not weigh either in favor or against withdrawal. Accordingly, because the first, second, and fourth *Moore* factors weighed strongly against withdrawal, defendant's motion to withdraw was properly denied. That the third and fifth factors did not present an obstacle to withdrawal did not compel a different conclusion in light of the strength of the first, second, and fourth factors. *See Bowman*, 348 F.3d at 416 (concluding that lack of delay alone was "insufficient to justify a withdrawal of his plea in view of all the other factors weighing heavily against granting the motion") (citing *Ubakanma*, 215 F.3d at 425); *Ubakanma*, 215 F.3d at 425 (denying motion to withdraw on the ground that "[c]ombining the six *Moore* factors, only one—the timeliness of Mr. Ubukanma's motion to withdraw his plea—weighs in his favor").

### III.

After defendant's motion to withdraw was denied and defendant absconded, the government filed a motion, pursuant to the All–Writs Act, 28 U.S.C. § 1651, for an order (i) restraining defendant and others acting in concert with him from transferring, selling, or otherwise diminishing the value of defendant's property and (ii) authorizing the government to file a notice of *lis pendens* on defendant's real property, to ensure the availability of the property for restitution. The government's motion was granted and a restraining order was entered on July 19, 2004. *See United States v. Abdelhadi*, Criminal Action No. 03–610–A (E.D.Va. July 19, 2004) (Re-

straining Order). Thus, the question addressed here is whether it was proper to enter this Order.[16]

■■■ Federal courts are authorized under the All–Writs Act, 28 U.S.C. § 1651, to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). While the language of the Act refers to writs issued in aid of jurisdiction, the Supreme Court has held that the Act empowers district courts to issue orders or injunctions "necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *see also United States v. Cohen*, 152 F.3d 321, 325 (4th Cir.1998) (stating that "courts have held that 'where an injunction is proper in order to protect or effectuate the judgments of a federal court, it is within that court's power to issue the injunction under the All Writs Act' ") (quoting *Ward v. Pennsylvania New York Cent. Transp. Co.*, 456 F.2d 1046, 1048 (2d Cir.1972)). A district court's power in this regard includes the power to enjoin or bind non-parties. *See In re Baldwin–United Corp.*, 770 F.2d 328, 338 (2d Cir.1985).

■■■ To begin with, there is no controlling circuit authority. The parties have cited only two published dispositions in which courts have entered post-judgment orders restraining a defendant's ability to sell, transfer, or dispose of assets to ensure the satisfaction of an order to pay restitution or fines.[17] A further search

---

**16.** Notably, at the July 19 sentencing, defendant's counsel was directed to file by July 21, in the event he elected to do so, a motion to vacate the restraining order. It appears that defendant's counsel has chosen not to file a motion in this regard.

**17.** *See United States v. Numisgroup Int'l. Corp.*, 169 F.Supp.2d 133, 137–39 (E.D.N.Y.

2001); *United States v. Gates*, 777 F.Supp. 1294, 1295 (E.D.Va.1991).

It is also worth noting that the Mandatory Victim Restitution Act, 18 U.S.C. §§ 3663–3664, provides that a court may, upon finding that a defendant is in default on a payment of restitution, "enter a restraining order or injunction, order the sale of property of the defendant... or take any other action neces-

disclosed only one additional published disposition on this question.[18] In *Numisgroup International*, a district court denied defendant's motion to vacate an order restraining defendant's coin collection valued at $430,000 where "sentencing and a substantial Order of restitution is imminent" and defendant had virtually no other assets. *Numisgroup Int'l Corp.*, 169 F.Supp.2d at 137–39. In *Gates*, a district court in this district upheld a pre-sentencing order "freezing" defendant's assets on the ground that "the court was merely assuring that assets available at the time of conviction would remain so until sentencing, so that the court could properly assess costs and fines." *Gates*, 777 F.Supp. at 1295. While *Gates* did not expressly rely on the All–Writs Act, the court sensibly concluded that a court's power to "freeze" assets prior to sentencing was necessary to ensure that the court could "impose a proper sentence under the guidelines and to fulfill the intent and mandate of Congress that a financially able defendant pay fines..., costs" and restitution would not be rendered meaningless. *Gates*, 777 F.Supp. at 1296 n. 7. Finally, in *Ross*, a district court denied defendant's motion to vacate an order re-straining defendant's assets prior to sentencing on the ground that the All–Writs Act empowered the court to enter the order "in aid of its ultimate authority to order restitution." *Ross*, 1993 WL 427415, at *1. Thus, these cases stand for the proposition that a court may enter a restraining order if (i) by doing so, the court will give effect to a previously-issued order and (ii) there is reason to believe that the restraining order is necessary for payment of a fine or restitution. *New York Tel. Co.*, 434 U.S. at 172, 98 S.Ct. 364.[19] This two-part test ensures that a district court only enters an order or injunction pursuant to the All–Writs Act when "necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *New York Tel. Co.*, 434 U.S. at 172, 98 S.Ct. 364.

There is no doubt that both prongs of this two-pronged test were met in this instance. First, the restraining order was intended to effectuate the previously-issued sentencing and restitution orders. *See United States v. Abdelhadi*, Criminal Action No. 03–610–A (E.D.Va. July 19, 2004) (Judgment and Conviction Order); *United States v. Abdelhadi*, Crim-

---

18. *See United States v. Ross*, 1993 WL 427415, at *1 (S.D.N.Y. Oct. 15, 1993) (Memorandum Order) (stating that "it seems totally appropriate [under the All–Writs Act] to restrain Dr. Ross from dissipating his assets prior to the time the Court enters the restitution order" when defendant had been found guilty of RICO charges and subject to $40,000 RICO forfeiture by a jury).

sary to obtain compliance with the order of... restitution." 18 U.S.C. § 3613A(a)(1); *see also* 18 U.S.C. § 3664(m)(1)(A)(i) ("An order of restitution may be enforced by the United States in the manner provided for in ... subchapter B of chapter 229 of this title [18 U.S.C. §§ 3611–3620].") This provision does not, however, directly apply here as defendant has not been found in default of the restitution order.

19. Notably, in *Numisgroup International*, *Gates*, and *Ross*, there was reason to believe that the defendants would default on their obligation to pay restitution or fines and/or would dispose of the restrained assets prior to satisfaction of the court's order to pay. See *Numisgroup Int'l. Corp.*, 169 F.Supp.2d at 138 (defendants had no other assets besides restrained coin collection); *Ross*, 1993 WL 427415, at *1 ("[T]here is a real question as to whether or not Dr. Ross currently has sufficient liquid assets to satisfy any judgment of restitution ordered by the Court."); *Gates*, 777 F.Supp. at 1294 (defendant had substantial assets in the possession of an attorney but had initially attempted to proceed *in forma pauperis* ).

inal Action No. 03–610–A (E.D.Va. July 19, 2004) (Restitution Order). Second, there was reason to believe that the restraining order was necessary to ensure the future availability of defendant's property to satisfy restitution. Defendant's flight and unknown whereabouts suggested a reasonable likelihood that defendant would (i) fail to pay restitution and/or (ii) make efforts to transfer, sell, or dispose of assets for either his own or his wife and children's benefit.

Nor does it weigh against the issuance of the restraining order that the government and Olympic have available numerous statutory methods to collect the restitution in the event defendant fails to pay. To be sure, the government may pursue (i) any civil remedies available under the Mandatory Victim Restitution Act ("MVRA") for the satisfaction of an unpaid fine or civil judgment such as a lien attached to defendant's property, 18 U.S.C. §§ 3613(f), 3664(m)(1)(A)(i),[20] (ii) any civil enforcement methods available under the Federal Debt Collection Procedures Act ("FDCPA"), such as a writ of garnishment or execution on defendant's property, 28 U.S.C. § 3001 *et seq.*,[21] and (iii) "all other available and reasonable means," 18 U.S.C. § 3664(m)(1)(A)(ii). Olympic, the victim, may, pursuant to 18 U.S.C. § 3664(m)(1)(B) of the MVRA, request that the clerk of court issue an "abstract of judgment" as a lien on defendant's property. 18 U.S.C. § 3664(m)(1)(B); *see also*

**20.** *See United States v. Vandeberg,* 201 F.3d 805, 813 (6th Cir.2000) (stating that "Section 3664 [of the MVRA] delineates a panoply of procedures pertinent to the issuance and enforcement of restitution…."); *United States v. James,* 312 F.Supp.2d 802, 805 (E.D.Va. 2004) ("The language of § 3613(a) thus makes clear that the government may enforce a criminal fine or restitution order against all of a defendant's property 'except that property which would be exempt from a levy for the payment of federal income taxes.'") (citing *United States v. Rice,* 196 F.Supp.2d 1196, 1199 (N.D.Okla.2002)); *United States v. Phillips,* 2001 WL 34046433, at *2 (M.D.La. July 3, 2001) (holding that government was authorized by MVRA to enforce restitution order by filing garnishment action against defendant's real property).

**21.** *See United States v. Minneman,* 38 Fed. Appx. 321, 322, 2002 WL 467961 (7th Cir. 2002) (unpublished disposition) (stating that government could initiate garnishment proceedings against defendant under FDCPA to collect on restitution order even though defendant had entered payment agreement with Bureau of Prisons); *United States v. Derington,* 17 Fed.Appx. 585, 586, 2001 WL 966257 (9th Cir.2001) (unpublished disposition) (affirming district court's issuance of writ of execution to government under FDCPA to aid in collection of order of restitution); *United States v. Rostoff,* 164 F.3d 63, 69–70 (1st Cir.1999) (holding that government could rely on FDCPA to collect on order of restitution); *United States v. Tyson,* 265 F.Supp.2d 788, 789–91 (E.D.Mich.2003) (issuing order of garnishment on retirement trust for collection on order of restitution).

The government appropriately points out, however, that the FDCPA, by its terms, applies only to a debt owed to the United States and not, as here, to a private party. *See* 28 U.S.C. § 3002(3) (" 'Debt' means an amount that is owing to the United States…."); *United States v. Bongiorno,* 106 F.3d 1027, 1037 (1st Cir.1997) ("[A] debt cannot be eligible for inclusion under the FDCPA if the United States is neither the formal owner nor the direct beneficiary of it."). Nonetheless, the only circuit to have addressed the reach of the FDCPA to debts owed to private parties in light of the passage of the MVRA—the Fifth Circuit—held that courts may enforce private restitution action pursuant to the FDCPA. *See United States v. Phillips,* 303 F.3d 548, 550–51 (5th Cir.2002); *Federal Trade Commission v. Nat'l Bus. Consultants, Inc.,* 376 F.3d 317, 2004 WL 1427049, at *4 n. 3 (5th Cir.2004) (unpublished disposition) ("[W]e previously held in *United States v. Phillips* that the government can use the FDCPA to enforce victim restitution orders in favor of a private party under the Mandatory Victim Restitution Act…."). The Fourth Circuit has not addressed this issue and it need not be resolved here.

*United States v. Gall,* 1998 WL 563850, at *1 (D.Conn. July 7, 1998) (Order) ("Pursuant to § 3664(m)(B), restitution orders may be converted into enforceable civil judgments."). Olympic may also file a separate civil action against defendant. That defendant may own his Maryland home as a joint tenant by the entirety with his wife would not necessarily preclude the government from levying that property to satisfy the order of restitution. *See United States v. Craft,* 535 U.S. 274, 288, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (holding that federal tax lien, a civil remedy permitted under the MVRA, 18 U.S.C. § 3613(d), could attach to property held as a tenant by the entirety in Michigan even though, under Michigan law, a tenant by the entirety cannot unilaterally alienate his interest in the property); *see also State v. One 1984 Toyota Truck,* 311 Md. 171, 533 A.2d 659, 667 (1987) (stating that unilateral alienation or conveyance is not sufficient to sever tenancy by the entirety in Maryland). Moreover, defendant's attempt to transfer his interest in the property to his wife to avoid payment of restitution could be set aside as a fraudulent transfer under the FDCPA. *See* 18 U.S.C. § 3301–3308.

While these various remedies available to the government and the victim may, in the fullness of time, play a role in assuring that restitution is paid, none can be instantly implemented and none ensures that, in the interim, defendant's assets will not be secreted, wasted or placed beyond the reach of the victim or the government. In short, none reasonably ensures the effectiveness of the Court's restitution order by ensuring that defendant's assets are not wasted or secreted. Only the restraining order can serve this function and hence, this is the reason it issued. Of course, an application to modify or vacate the restraining order may be filed by an appropriate party should circumstances exist or arise in the future indicating good cause to do so.

## IV.

Accordingly, for the reasons set forth above, it was proper here (i) to deny defendant's motion to withdraw his guilty plea and (ii) to grant the government's motion for an order restraining defendant's and others' abilities to sell, transfer, or engage in any other action that would decrease the value of defendant's property and authorizing the government to file a notice of *lis pendens* on defendant's real property.

Appropriate orders have issued. *See United States v. Abdelhadi,* Criminal Action No. 03–610–A (E.D.Va. July 9, 2004) (Order); *United States v. Abdelhadi,* Criminal Action No. 03–610–A (E.D.Va. July 19, 2004) (Restraining Order).